**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| *ex rel*. [UNDER SEAL], | ) |
| | ) |
| Plaintiff-Relator, | ) |
| | ) |
| v. | ) |
| | ) |
| [UNDER SEAL], | ) |
| | ) |
| Defendants. | ) |
| | ) |

C.A. No. _____3:14-cv-00382-JFA_____

**COMPLAINT**
**(Jury Trial Demanded)**

# FILED *IN CAMERA* AND UNDER SEAL
# PURSUANT TO 31 U.S.C. § 3730(b)(2)
# (Exempt from ECF)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>    Plaintiff,<br><br>*ex rel*. CATHERINE A. SCHAEFER,<br>M.D.,<br>    Plaintiff-Relator,<br><br>    v.<br><br>FAMILY MEDICINE CENTERS OF<br>SOUTH CAROLINA, LLC, STEPHEN<br>F. SERBIN, M.D., PETER J. STAHL,<br>M.D., and VICTORIA SERBIN,<br><br>    Defendants. | C.A. No. ___3:14-cv-00382-JFA___<br><br>**FILED *IN CAMERA* AND**<br>**UNDER SEAL PURSUANT TO**<br>**31 U.S.C. § 3730(b)(2)**<br><br>**COMPLAINT**<br><br>**(Jury Trial Demanded)** |

## I.    INTRODUCTION

1.    Since at least 2013, and likely far earlier, Family Medicine Centers of South Carolina, LLC (FMC) has engaged in a false claims scheme to defraud the United States of America by overcharging federal health insurance programs, specifically Medicare and Tricare, in excess of the actual services provided to federally-insured patients.

2.    The false claims scheme employed by FMC is a deliberate and concerted effort by FMC to increase profits by maximizing billable charges to federal insurance programs through miscoding, up-coding,[1] and overutilization strategies that overstate the level of care actually provided to patients and that bill for unnecessary and duplicative services. As FMC's billing and collections manager, Melanie Strickland explained with respect to one aspect of the scheme, "we

---

[1] "Up-coding" is a common form of Medicare fraud in which the provider bills Medicare for medical services or equipment under a code that is more expensive than what a patient actually needed or was provided.

change the codes on Medicare and Tricare patients to [a problem-oriented CPT code] because Medicare and Tricare won't pay for a physical."

3.      Defendants have institutionalized overbilling and overutilization at FMC at great cost to the United States and its federal health insurance programs which only reimburse healthcare providers for services that a physician deems "medically necessary." FMC is presently the largest doctor-owned family practice in the Columbia area with more than 18,000 Medicare and Tricare patients: the Defendants single largest payor sources.

4.      Remarkably, there is nothing covert about this scheme. FMC's CEO, Stephen F. Serbin, M.D., holds monthly staff meetings where he and his wife, FMC Clinical Services Manager Victoria Serbin, a.k.a. "the Coding Queen," provide written reports documenting the practice's success maximizing charges to federal (and private) insurance programs. FMC presumably believes it is concealing this fraud from detection by coaching physicians and staff on how to fraudulently dictate orders to "justify" fraudulently billed services.

5.      While employed by FMC from April 2013 until November 2013, Plaintiff-Relator Catherine A. Schaefer, M.D., personally witnessed this scheme as FMC nurses and billing clerks added and changed billing codes on her patient's "Superbills." Dr. Schaefer's efforts to correct FMC's billing practices resulted in conflict with FMC management and ultimately her termination.

6.      After FMC terminated Dr. Schaefer (allegedly "for cause"), Serbin promised Dr. Schaefer two months' severance pay and to release her from a covenant not to compete in exchange for her falsely stating that "you have not been aware of any violation of federal, state or local laws, rules or regulations that applies [sic] to the Practice and its operations during your employment." Dr. Schaefer refused.

7.      Dr. Schaefer now brings this *qui tam* action for the purpose of ending this fraud and recovering monies defrauded from the Medicare and Tricare federal health insurance programs. Dr. Schaefer also seeks damages arising from her wrongful termination by Defendants for objecting to the illegal practices at issue in this action.

## II.    JURISDICTION

8.      Dr. Schaefer brings this action on behalf of herself and the United States for violations of the federal False Claims Act, 31 U.S.C. §§ 3729 et seq.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732.

9.      This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) and because Defendants transact business in this District and numerous acts prohibited by 31 U.S.C. § 3729 occurred in this District.

10.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Defendants transact business in this District and numerous acts proscribed by 31 U.S.C. § 3729 occurred in this District.

11.     Dr. Schaefer's claims and this Complaint are not based upon the prior public disclosures of allegations or transactions in a federal criminal, civil, or administrative hearing in which the Government or its agent is a party; in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or from the news media, as enumerated by 31 U.S.C. § 3730(e)(4)(A). To the extent that there has been a public disclosure unknown to Dr. Schaefer, she is the "original source" and the public disclosure is a result of Dr. Schaefer voluntarily providing this information to the United States prior to filing this *qui tam* action. See 31 U.S.C. § 3730(e)(4)(B).

## III.    PARTIES

12.    Plaintiff-Relator Catherine A. Schaefer, M.D., is a medical doctor with a master's of science in molecular genetics. Dr. Schaefer earned her medical degree from the University of South Carolina's School of Medicine in 1994. In 2003, Dr. Schaefer opened her own private family medical practice. In the decade that followed, she built a successful solo practice of approximately 3,000 patients, many of whom were insured through Medicare and Tricare. As a solo practitioner with a small support staff, Dr. Schaeffer took care to educate herself about Centers for Medicare & Medicaid Services (CMS) billing regulations and comport her billing practices with federal law. In April 2013, Dr. Schaefer closed her practice and went to work at FMC's Springwood Lake Family Practice location in Northeast Columbia, bringing with her the 3,000-patient practice she built over the previous ten years. On November 6, 2013, FMC terminated Dr. Schaefer for objecting to the illegal practices at issue here.

13.    Family Medicine Centers of South Carolina, LLC (FMC) is a limited liability corporation incorporated under the laws of the State of South Carolina. FMC is believed to be the largest family practice healthcare provider in Columbia, South Carolina serving approximately 40,000 patients at six office locations with an estimated annual revenue of $18.97 million. Medicare and Tricare are the practice's largest third-party payor sources.

14.    Defendant Stephen F. Serbin, M.D. (Serbin), is a citizen of the State of South Carolina and is believed to be a resident of Richland County. Serbin is the CEO & Medical Director of FMC and one of the owners and members of FMC. Both in writing and in person, Serbin directs and coaches FMC physicians, nurses, and billing staff on how to overbill FMC patients in order to generate revenue. As both a member of FMC's limited-liability corporation

and as its CEO, the ill-gotten profits earned by FMC inure directly to Serbin in the form of salary, bonuses, and member distributions.

15.    Defendant Peter J. Stahl, M.D. (Stahl), is a citizen of the State of South Carolina and is believed to be a resident of Richland County. Stahl, along with Serbin, is one of the founders, owners, and members of FMC and, as such, is responsible for FMC's management. As a member of FMC's limited-liability corporation, the ill-gotten profits earned by FMC inure directly to Stahl's benefit in the form of salary, bonuses, and member distributions.

16.    Defendant Victoria Serbin (Ms. Serbin), is a citizen of the State of South Carolina and is believed to be a resident of Richland County. Ms. Serbin is the Clinical Services Manager at FMC and the wife of the CEO, Stephen Serbin. Ms. Serbin is known at FMC as the "Coding Queen," and is responsible for reviewing or "scrubbing" all of FMC's claims to third party payors, such as Medicare or Tricare, prior to submission in order to ensure that FMC maximizes charges and minimizes unwanted attention from CMS. The benefits of this false claims scheme inure directly to Ms. Serbin in the form of compensation paid to her by FMC and through her husband's ownership interest in the corporation.

## IV.    FACTUAL ALLEGATIONS REGARDING REGULATORY BILLING REQUIREMENTS FOR THE MEDICARE AND TRICARE FEDERAL INSURANCE PROGRAMS.

### A.    The Medicare Insurance Program

17.    The Medicare Program authorizes payment for institutional and physician care, and related services. See 42 U.S.C. §§ 1395c & 1395k et seq. (generally, Parts A & B). The Department of Health and Human Services (HHS) is generally responsible for the administration and supervision of the Medicare Program. See id. § 1395hh (vesting the HHS Secretary with the power "to prescribe such regulations as may be necessary to carry out the administration of the

6

insurance programs"). In order to effectuate this statutory mandate, HHS created the Centers for Medicare and Medicaid Services (CMS), a component of HHS tasked with administering the Medicare Program.

18.     Even before a physician can bill Medicare, the physician must become an eligible Medicare healthcare provider. In order to establish eligibility, a provider must enter into an agreement with CMS. See generally, 42 C.F.R. §§ 489.1 et seq. By entering into a provider agreement with Medicare, the provider agrees, *intra alia*, to (a) limit its charges to those allowed under the program (see 42 C.F.R. §§ 489.30 et seq.), and (b) comply with regulations requiring the return (or other disposition) of monies collected from beneficiaries or any other person in excess of what Medicare permits. 42 C.F.R. § 489.20 (a) & (b).

19.     Healthcare providers are prohibited from making excessive claims (or causing the submission of excessive claims) or from furnishing unnecessary health services. See 42 C.F.R. § 1001.701 (permitting the exclusion of providers for violations).

20.     The touchstone for Medicare insurance coverage is medical necessity. The Medicare Program (Parts A & B) excludes from Medicare coverage "any expenses incurred for items or services [...] which [...] are not *reasonable and necessary* for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A) (emphasis added).

21.     The Secretary is responsible for specifying services covered under the "reasonable and necessary" standard and has wide discretion in selecting the means for doing so. See 42 U.S.C. § 1395ff(a). Typically, the Secretary acts through formal regulations, informal instructional manuals, and letters.

22.     Presently, the Secretary provides guidance to eligible providers pursuant to a series of Manuals, published by CMS, which are available to the public on the Internet. See generally, CMS Internet-Only Manuals (IOMs), available at: http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Internet-Only-Manuals-IOMs.html (last visited Dec. 17, 2013) [hereinafter "CMS IOMs" or "Manuals"]. The Manuals offer a definitive explanation of the Medicare regulatory regime and what providers must do to comply with it. See 42 U.S.C. § 1395ff(a) (giving the Secretary authority to promulgate these guidelines).

23.     Typically, physicians are compensated for the services they provide Medicare patients on a fee-for-service basis as determined by Medicare's fee schedule. 42 U.S.C. § 1395w-4. To obtain compensation physicians must deliver a compensable service, certify that the service was medically necessary for the health of the patient, and certify that the service was personally furnished by the physician (or under his or her immediate supervision), and determine the appropriate diagnosis and procedure code to describe the problem and service for billing.

24.     Proper Medicare billing requires honest and accurate "coding" by the provider. Coding is the process by which a provider marks a "Superbill" to reflect services rendered. This typically requires a provider to circle one or more billing codes that correspond to the treatment provided. Each code, or combination of codes, is tied to a specific fee that Medicare will pay the provider for the service rendered to the insured. Generally, more serious or complex services entitle the provider to greater compensation.

25.     Upon discharging a beneficiary from treatment, a Medicare provider submits a reimbursement claim for the services provided. Generally, these requests for payment are submitted to "administrative contractors," typically third party insurance companies tasked by CMS with administering Medicare's claims processing and payment. See 42 U.S.C. § 1395h &

1396kk-1. From the healthcare provider's perspective, when a Medicare-insured patient receives covered treatment, the claim for services rendered is submitted to CMS's administrative contractor which processes and pays the claim as the United States' agent.

26.     In order to ensure that claims are properly processed, Medicare regulations require that healthcare providers furnish sufficient information to these fiscal intermediaries to allow them to discern whether payment is owed and in what amount. See 42 C.F.R. § 424.5(a)(6). These claims are then processed and paid by the claims administrator who, in turn, is reimbursed by the United States.

27.     Because Medicare relies heavily on the honesty and candor of eligible healthcare providers to submit bills to intermediaries tasked with administering federal insurance programs, it imposes an affirmative duty on healthcare providers to disclose all known errors and omissions in reimbursement claims submitted to Medicare intermediaries. See 42 U.S.C. § 1320a–7b(a) (concerning criminal penalties for violations concerning federal healthcare programs).

28.     FMC is an eligible Medicare provider and a party to a Medicare provider agreement.

**B.     The Tricare Federal Insurance Program**

29.     The Tricare federal health insurance program provides health insurance coverage to United States service members and their dependents. Tricare is managed by the Defense Health Agency and administered by four separate geographic service regions. Humana Military Healthcare Services, Inc. is the Tricare managed care contractor for the South region.

30.     Tricare health services are provided through network and non-network providers. Medicare-certified providers are also Tricare-authorized providers. Authorized providers are either "network providers" or "non-network providers." "Network providers" are hospitals,

9

medical facilities, doctors, and healthcare professionals who enter into an agreement with the managed care contractor to provide services at an agreed reimbursement rate. 32 C.F.R. § 199.14(a). Non-network providers do not execute an agreement with the managed care provider but are reimbursed at rates established by Tricare regulations. Id.

31.     Like Medicare, medical necessity is the touchstone for what constitutes a reimbursable expense. Tricare providers can only provide services and supplies "furnished at the appropriate level and only when and to the extent medically necessary," and such care must "meet professionally recognized standards of health care [and be] supported by adequate medical documentation . . . to evidence the medical necessity and quality of services furnished, as well as the appropriateness of the level of care." 32 C.F.R. § 199.6(a)(5); see also § 199.6(a)(1). Services provided in excess of what is medically necessary are not compensable services for which a provider can claim payment. Id.

32.     In addition to these regulatory prohibitions against charging for unnecessary and excessive services, network providers sign a provider agreement in which they agree to adhere to contractual billing requirements as well as all other Tricare program requirements. This includes, intra alia, agreeing (a) to limit charges to those allowed under the program, and (b) to comply with regulations requiring the return (or other disposition) of monies collected from beneficiaries or Tricare in excess of what the Tricare program permits.

33.     Like Medicare, after treating a Tricare insured patient, providers submit claims to the managed care contractor for payment using a claim form (e.g., Form "HCFA 1500"). This form details the services provided using CPT Codes taken from a patient's Superbill as marked by the treating physician. Also like Medicare, each code, or combination of codes, is tied to a specific fee that Tricare will pay the provider for the service rendered.

34.    FMC is Tricare-authorized provider.

**C.    Current Procedural Terminology (CPT) Coding**

35.    Current Procedural Terminology Coding or "CPT" Coding was developed by the American Medical Association and is the most widely used widely accepted medical nomenclature for reporting medical procedures and services to public and private health insurance programs. Medicare and Tricare both require providers to utilize CPT Coding to submit claims for payment. CMS's Official ICD-9-CM Guidelines for Coding and Reporting provide general coding guidance while the ICD-9-CM-Coding Guidelines for Outpatient Services provides specific guidance for outpatient facilities and physician offices.

36.    Proper CPT coding distinguishes between diagnostic office visits and specific procedures or services that physicians might perform once a diagnosis is made. For example, the threshold inquiry a provider must make prior to billing for an office visit entails three components: (1) reviewing the patient's history, (2) examining the patient, and most importantly (3) a diagnostic decision as to the proper course of treatment. The complexity of the physicians' diagnostic decision-making process is the most important factor in determining how to code an office visit because it determines how much history and examination is necessary in order to make a proper diagnosis. In other words, where the patient's symptoms are clear and present a minimal threat to the patient's health, the CPT coding regime assumes that the physician will diagnose the problem more quickly. However, regardless of the complexity, an office visit always includes some diagnosis of a problem presented by the patient.

37.    More specifically, evaluation and management (E/M) office visit CPT codes range from Level 1 to Level 5 from least to most complex services. Generally, any problem-related office visit includes three essential components as part of the healthcare provider's

11

compensable service: (1) review of the patient's history, (2) an examination, and (3) medical decision making.

38.     The complexity of each of these components informs the level at which the office visit is appropriately billed, as does the time required to treat the patient. Of these three components, the complexity of medical decision making—often tied to the severity of the patient's problem—controls most heavily. This tiered coding system distinguishes between new patients (CPT Codes 99201-99205) and established patients (CPT Codes 99211-99215) because the former are assumed to require a more detailed history, thus requiring more time, due to the physicians' unfamiliarity with the patient.

39.     For example, a Level 1 visit for an established patient (CPT Code 99211) entails a problem focused history and examination resulting in straightforward medical decision making. These simple diagnoses typically involve approximately five minutes of face-to-face interaction with the physician or nurse. A Level 2 established patient visit (CPT Code 99212) entails expanded patient history and examination but still straightforward medical decision making. A Level 2 visit typically requires 10 minutes of face-to-face doctor-patient interactions. A Level 3 established patient visit (CPT Code 99213) entails detailed history and examination and medical decision making of low complexity with physician interaction typically lasting 15 minutes. A Level 4 established patient visits (CPT Code 99214) entails a comprehensive history and exam and moderately complex medical decision making, all lasting approximately 25 minutes. Finally, a Level 5 established patient visit (CPT Code 99215) entails a comprehensive history and examination with highly complex medical decision making, typically lasting 40 minutes or more.

40.     Unlike a Level 3 or 4 office visit, a Level 5 visit is very rare—so rare that, in Dr. Schaefer's experience, it is unlikely for a family medicine practitioner to be presented with such

a case even once per day. These cases involve highly complex diagnosis, require a comprehensive examination of the patient, and typically involve a 40-60 minutes of treatment by the physician. Generally, symptoms that would give rise to such a case would also cause the average patient, or their caretaker, to seek emergency medical assistance in lieu of seeking an appointment with their primary care physician.

41.     Unlike an office visit, a procedure code merely entails a specific medical service. For example, if a patient presents a lesion during an office visit, the physician might advise the patient to schedule a future visit to remove the lesion. When the patient returns for the subsequent lesion-removal visit, the physician should bill the visit using the lesion special procedure/surgery code (CPT Code 17003). Notably, the lesion-removal visit would not also include an office visit billing code since the physician already diagnosed the lesion for removal during the earlier visit. Assuming the patient fails to present any additional problem, the physician is only entitled to compensation for the lesion-removal procedure.

42.     Laboratory tests are also coded using CPT coding. When a physician determines a laboratory test is medically necessary, he or she must support that determination with a contemporaneously created physician note and an order that the test be conducted. All diagnostic tests must be ordered (in the form of a written note, telephone call, or electronic transmission) by the physician providing treatment. 42 C.F.R. § 410.32. Additionally, since only medically necessary testing is compensable by federal insurance programs, a physician should not order panel testing—including multiple individual tests—when a single stand-alone test will suffice.

IV.     FACTUAL ALLEGATIONS REGARDING DEFENDANTS' FALSE CLAIMS

43.     When Dr. Schaefer joined FMC on April 1, 2013, she brought with her approximately 3,000 patients that she had cultivated during her 10 years as a solo practitioner.

During this time she formed a close doctor-patient relationship with many of her patients such that they had grown accustomed to the care and precision offered by Dr. Schaefer's solo practice.

44.    Shortly after joining FMC, a number of Dr. Schaefer patients began complaining about inaccurate billing, then being handled by FMC. For example, in April 2013, Dr. Schaefer was confronted by John Doe 1,[2] one of her longtime patients who received regular B-12 vitamin shots. John Doe 1 complained that, unlike Dr. Schaefer's solo practice, the FMC billing department required him to make a co-pay for the administration of his B-12 shot.

45.    John Doe 1's Superbill indicated that he was being billed for a nursing visit—a Level 1 office visit (CPT Code 99211)—in addition to the injection procedure. John Doe 1 was being charged a co-pay because, unlike Dr. Schaefer's practice before, FMC had added a problem-related office visit code to his Superbill.

46.    In an effort to resolve John Doe 1's complaint, Dr. Schaefer spoke to Emily Williams, FMC's Senior Practice Administrator. Dr. Schaefer provided Williams with Medicare literature explaining that the guidelines do not authorize charging for a separate problem-related nursing visit in addition to the B-12 injection procedure when a provider merely administers an injection and nothing more.

47.    Several days later, Williams spoke to Dr. Schaefer and told Dr. Schaefer that she had looked into it and that Dr. Schaefer was correct and that she would change the practice in the FMC billing department.

48.    But several weeks after this conversation, John Doe 1 returned for another B-12 injection and again complained to Dr. Schaefer that he was, once again, improperly charged a co-pay for his injection. John Doe 1 again provided his Superbill to Dr. Schaefer.

---

[2] Patients shall be referred to as John and Jane Doe in order to protect their privacy.

49.    Dr. Schaefer took the Superbill to Rachel Lovato, FMC's Front Office Supervisor, and explained it was incorrect. Lovato told Dr. Schaefer that she had spoken to Vicki Serbin who told her it was "ok" to bill for a nursing visit and charge a co-pay in addition to the injection procedure.

50.    After this incident with John Doe 1, Dr. Schaefer reviewed a number of other patients' files who she knew to regularly receive B-12 injections. Dr. Schaefer also reviewed a number of patient files that she knew to regularly receive testosterone injections and flu shots. These files evidenced a widespread practice of billing patients (and their insurers) for nursing visits any time an injection procedure is administered and charging patients for an office visit co-pay.

51.    Dr. Schaefer witnessed other incidents that raised her suspicions concerning FMC's billing practices. For example, within her first couple weeks at FMC, FMC received notice of a CMS audit. CMS regularly audits a selection of patient files to ensure compliance with CMS guidelines. Prior to the audit, Dr. Schaefer witnessed Elizabeth Skipper, FMC's Nursing Supervisor, moving a large number of patient charts into a procedure room. Skipper told Dr. Schaefer that she was moving the charts into the procedure room so they could be reviewed by FMC prior to the CMS audit. Dr. Schaefer believes FMC was "scrubbing" these charts to ensure they included physician notes capable of justifying the services billed.

52.    After making these initial discoveries, Dr. Schaefer began investigating other questionable FMC practices. Her findings evidence a concerted effort by the Defendants to fraudulently increase healthcare services billed to patients and their insurers, including federal insurance programs, in excess of the fees actually earned or justified as medically necessary. These schemes, described below, generally fall into one of four categories.

i.  First, Defendants systematically double bill patients and their insurance providers for medical services and supplies included in the cost of the proper procedure code. Even when insurers refuse to pay these duplicative costs, FMC still attempts to collect from patients by charging co-pays and engaging in balance billing.

ii. Second, Defendants systematically miscode preventative office visits, such as physicals, as problem related visits and up-code legitimate problem-related office visits at a higher level than is medically justified given the complexity of the problem presented by the patient.

iii. Third, Defendants have adopted "standing orders" whereby patients undergo extensive laboratory testing as a matter of course and without a physician determining that such testing is medically necessary.

iv. Fourth, when labs are medically necessary, Defendants require physicians to order expensive panel tests that include unnecessary tests in addition to the medically necessary test that could be obtained as a stand-alone test at less cost.

53.    Upon discovering these practices, Dr. Schaefer made a good faith effort to bring them to the attention of FMC staff by explaining proper billing practices. When these efforts were unsuccessful, Dr. Schaefer complained to Serbin in an effort to alert him of this fraud and solicit his assistance in correcting these practices. As the architect of these practices and FMC's efforts to conceal them, Serbin rebuffed Dr. Schaefer and accused her of impropriety in an effort to bully her into complicity.

54.    When this proved unsuccessful, FMC terminated Dr. Schaefer "for cause" only to offer her money that same day in an effort to ascertain a false statement from Dr. Schaefer that she was not aware of any violation of federal, state, or local law by FMC. Dr. Schaefer refused and this action followed.

A.    **Double Billing for Services and Supplies.**

55.    FMC systematically double bills patients and their insurance providers for medical services and supplies included in the cost of the proper procedure code.

56.    FMC consistently miscodes procedure-related visits by adding a problem-related office visit code in addition to the procedure code. This practice effectively bills the patient and his insurer twice: once using the procedure code and again for an unjustified problem-related office visit.

57.    For example, on April 23, 2013, Dr. Schaefer treated Jane Doe 1, a Medicare insured. The purpose of Jane Doe 1's visit was the removal of several warts; a procedure Dr. Schaefer completed as planned.

58.    Dr. Schaefer coded Jane Doe 1's Superbill (using blue ink) by circling the Special Procedures/Surgery codes 17000 and 17003 and signing the Superbill.

59.    But after Dr. Schaefer submitted the Superbill to the FMC billing clerk, another employee (using black ink) added a Level 4 office visit code at a cost of $100.43 to Medicare.

60.    Jane Doe 1's wart removal procedure did not entitle FMC to the additional compensation for a detailed, Level 4 problem-related office visit for two reasons. First, FMC would have been fully compensated for the procedure pursuant to the two procedure codes circled by Dr. Schaefer.

61.    Second, Jane Doe 1's April 23 visit did not qualify for a problem-related office visit because Dr. Schaefer diagnosed DMT's lesions for removal during a prior office visit. In other words, Dr. Schaefer did not engage in any medical decision making on April 23, she merely performed a procedure pursuant to her earlier diagnosis.

17

62.     By adding a problem-related office visit to the April 23 Superbill, FMC charged Jane Doe 1 and Medicare *twice* for the same diagnostic service.

63.     As another example, on April 2, 2013, Dr. Schaefer removed several lesions for Jane Doe 2 and performed a biopsy. She coded Jane Doe 2's Superbill by circling the appropriate procedure codes: Codes 11100 and 17003.

64.     Just like Jane Doe 1, Dr. Schaefer has previously seen Jane Doe 2 and diagnosed the lesions for removal and biopsy.

65.     But once again, after Dr. Schaefer submitted the Superbill to the billing staff, a staffer miscoded the Superbill by improperly adding an "Expanded Visit" code with an "x".

66.     This double billing scheme is not limited to physician office visits. As mentioned above with respect to John Doe 1, FMC regularly miscodes routine injection and blood draw procedures by charging for a Level 1 nursing visit in addition to the procedure actually administered.

67.     For example, on April 8, 2013, Jane Doe 3 was seen by a nurse for a blood draw. The sole purpose of Jane Doe 3's visit was the blood draw pursuant to two lab tests.

68.     But instead of merely coding the Superbill for the blood draw and labs, a FMC employee also coded a Level 1 nursing visit (CPT Code 99211). This improper, excess charge is believed to have been submitted to Jane Doe 3's insurer: Medicare.

69.     On April 8, 2013, John Doe 2, a Medicare insured, presented for one of his regularly scheduled testosterone injection. John Doe 2 brings his testosterone with him and FMC merely assists him by giving him the injection. But in addition to the injection procedure, FMC also charged John Doe 2 for a Level 1 nursing visit.

70.     FMC also miscodes patient bills by charging patients for medical supplies already included in the cost the procedure. This practice bills the patient and their insurer twice for medical supplies: once as included in the CPT procedure code and again using the wrongly added medical supply code. For example, a lesion removal procedure requires the use of sterile surgical tray, but the use of these instruments, and their cost, are included in the lesion removal procedure codes. But FMC regularly charges patients a second time for the surgical tray.

71.     During her orientation, Dr. Schaefer met with Serbin to discuss a variety of topics incidental to her joining FMC. During that meeting Serbin instructed Dr. Schaefer that she should bill for a surgical tray as a part of any procedure requiring the use of a surgical tray. Dr. Schaefer refused to do so.

72.     Notwithstanding her refusal to double bill for medical supplies, Dr. Schaefer discovered other FMC staff miscoding her patients' Superbills to include surgical tray charges.

73.     For example, on April 2, 2013, Jane Doe 2, discussed *supra*, had a several lesions removed and had a skin biopsy performed by Dr. Schaefer. Jane Doe 2's Superbill includes an unwarranted surgical tray charge (CPT Code A4550) even though these medical supplies are already included in the cost of the procedures billed.

74.     Dr. Schaefer believes a FMC nurse went behind Dr. Schaefer and re-coded the Superbill.

75.     FMC also bills patients for supplies in conjunction with pulse oximetry and injections. FMC employs this same practice with respect to Level 1 office visits billed in conjunction with lab draws and injection procedures.

76.     When federal insurance programs refuse to pay for medical supplies or equipment in conjunction with a procedure that includes the same, FMC bills its patients for the rejected claim, an illegal practice known as "balance billing."

77.     On one such occasion, a federally insured patient named Jane Doe 4 received a balance bill from FMC and contacted Medicare. After talking to Medicare, Jane Doe 4 contacted FMC's billing department which immediately backed down and told her she did not owe anything and should disregard the invoice.

78.     Dr. Schaefer believes that most patients who receive FMC's illegal balance bills unwittingly pay.

**B.     Converting Physicals and AWVs into Problem-Related Office Visits.**

79.     As noted above, Medicare reimburses providers for problem-related office visits at a higher rate than ordinary physical exams. Problem-related visits are reimbursed at a varying rate depending on the complexity of the problem as measured on a scale from Level 1 to Level 5, with Level 5 being the most serious, time-consuming, and financially lucrative.

80.     FMC has implemented a system whereby it systematically converts wellness visits into problem-related visits and up-codes problem-related visits to Level 4 and Level 5 visits in order to maximize profits.

81.     For example, on April 5, 2013, Dr. Schaefer performed a routine physical on Jane Doe 5. After Dr. Schaefer circled "Est. Patient PE" (Established Patient Physical Exam), a FMC employee overrode Dr. Schaefer's coding by crossing her code out and writing in Code 99215— a Level 5 Comprehensive visit.

82.     Not only did this unjustifiably increase the charges paid by Jane Doe 5's insurer, Tricare, but it also caused Jane Doe 5 to pay 20% copay out-of-pocket.

83.     Had FMC properly billed Jane Doe 5 as Dr. Schaefer had coded her Superbill, Tricare would have covered 100% of the costs of her visit, albeit at a lower reimbursement rate to FMC.

84.     Similarly, on September 25, 2012, Dr. Schaefer saw John Doe 3 for a follow-up to his annual physical. But after Dr. Schaefer coded John Doe 3's Superbill, a FMC nurse crossed off Dr. Schaefer's CPT Codes and wrote in the code for a Level 5 visit.

85.     Dr. Schaefer had tried to anticipate and prevent this modification by writing her initials ("CAS") next to her coding, but to no avail.

86.     The FMC employee also ordered an EKG and a Flu shot, unbeknownst to Dr. Schaefer at that time.  The bill was submitted to Medicare for payment.

87.     Generally, Medicare authorizes payment for an initial preventative physician examination (IPPE) as a "welcome to Medicare" visit followed by an annual wellness visit (AWV), and then a subsequent AWV each year after that. See Medicare Website, available at: http://www.medicare.gov/coverage/preventive-visit-and-yearly-wellness-exams.html (last visited Jan. 15, 2014).

88.     An IPPE/AWV includes a health risk assessment questionnaire and physician visit to discuss a personalized prevention plan that considers factors such as family history, height, weight, blood pressure, or other routine measurements. But these health assessment counseling visits do not include a physical examination, like a routine physical or a problem-oriented visit would. They are purely informational counseling sessions to help patients prevent future health problems.

89.     But FMC aggressively markets these visits to patients as a pretext to get them in the door where they can then convert the visit into a problem oriented visit.

90.    For example, on April 30, 2013, Dr. Schaefer saw John Doe 4, a Medicare insured, for a subsequent AWV. But after Dr. Schaefer circled the proper CPT code, another FMC employee converted John Doe 4's visit into a problem-oriented Level 4 visit.

91.    FMC coaches its physicians to dictate orders and notes capable of concealing this miscoding scheme. While FMC couches this instruction as an effort to ensure that it is able to collect for services rendered, it also instructs physicians on how they can "justify" Superbill charges with dictation.

92.    Notably, FMC emphasizes what constitutes adequate "justification" rather than what is medically necessary.

93.    FMC's justification-focused approach also fails to consider that any problem-related office visit must be supported by a chief complaint presented by the patient. In other words, even though a patient has multiple chronic medical problems, the mere existence of those problems does not support billing a routine physical as a problem-oriented visit absent an actual patient complaint.

94.    FMC has instructed its billing staff to perpetrate and conceal this scheme. On numerous occasions, Dr. Schaefer discovered that billing staff coded her patients' Superbills for additional services that she neither provided nor ordered.

95.    Billing staff regularly re-coded Superbills in the same manner as Jane Doe 1's, discussed above, and then return the patient chart and Superbill to Dr. Schaefer with instructions to dictate notes capable of "justifying" the fraudulent claims.

96.    For example, several days after treating Jane Doe 1, her chart was returned to Dr. Schaefer's office with a note from the billing clerk asking her to dictate a note capable of

justifying a Level 4 office visit. Dr. Schaefer refused, returning the chart to the clerk with a handwritten note explaining that the fraudulent coding needed to be corrected.

### C.    Up-coding Problem-Oriented Office Visits.

97.    In addition to converting preventative visits into problem-oriented office visits, FMC also up-codes legitimate problem-oriented visits in order to increase its reimbursement.

98.    For example, on September 23, 2013, Dr. Schaefer saw Jane Doe 6 for a detailed Level 4 office. But after Dr. Schaefer submitted Jane Doe 6's Superbill to the billing department, a FMC wrote in a Level 5 code over the top of Dr. Schaefer's coding.

99.    While Jane Doe 6 presented Dr. Schaefer with symptoms of hip pain, high cholesterol, and blood in stool—a legitimate Level 4 visit—her September 23 visit failed to rise to the level of comprehensive medical decision making that would support a Level 5 visit.

100.    The cost of Jane Doe 6's visit was submitted to her insurer, Medicare, for payment.

101.    On September 24, 2013, Dr. Schaefer saw Jane Doe 7, a Humana Choice PPO insured. Humana Choice PPO is a Medicare Advantage Preferred Provider Organization.

102.    Just like Jane Doe 6, Jane Doe 7 presented with several symptoms requiring Dr. Schaefer to conduct a detailed, but not comprehensive, exam.

103.    During this visit, Dr. Schaefer continued to monitor several chronic conditions from which Jane Doe 7 suffers. However, on September 24, Dr. Schaefer failed to detect any discernible change in the acuity of Jane Doe 7's conditions.

104.    In other words, aside from monitoring her condition, Dr. Schaefer's diagnosis of what was medically necessary remained unchanged and thus no additional medical decision

making occurred. While acuity and change in treatment can justify billing an office visit at a higher level, Jane Doe 7's visit did not meet this standard.

105.    After Dr. Schaefer coded Jane Doe 7's Superbill for a Level 4 visit, a FMC billing clerk overruled Dr. Schaefer's assessment and wrote in a Level 5 comprehensive visit.

106.    Another FMC employee also ordered a glucose blood draw for Jane Doe 7.

107.    Dr. Schaefer did not order this test because it is wasteful. Jane Doe 7 is a diabetic. Accordingly, she tests her own glucose levels daily. FMC's decision to order a laboratory blood test incurs unnecessary cost to confirm what Jane Doe 7 is able to discern using her at-home test.

108.    This up-coding policy is further illustrated by FMC's policy of billing all new patient office visits as Level 4 visits or higher. New patient office visits are reimbursed at a higher five-tier rate because a physician is presumed to spend additional time establishing and reviewing a new patient's medical history as compared to an existing patient. But FMC goes further, billing all new patient visits as Level 4 or higher without regard for the services actually provided.

**D.    Standing Orders to Over-utilize and Up-code Laboratory Testing.**

109.    FMC has also implemented standing orders to conduct unnecessary lab testing, ordered as a matter of course by non-physician staff, in conjunction with routine physicals.

110.    This scheme works in conjunction with FMC's efforts to convert wellness visits into problem-oriented visits since most insurers, including federal health insurers, will not compensate FMC for these diagnostic services absent some medical necessity.

111.    More specifically, FMC requires each patient 50 years and older to also undergo an annual "complete physical exam" (CPX). Once a CPX is scheduled, FMC follows "standing

orders" or "protocols" whereby office staff schedules each patient for blood and urine testing, an EKG, and a chest x-ray, all of which is completed prior to seeing the physician.

112.    While nothing prohibits a physician from ordering laboratory tests during a CPX, these tests are not a covered preventative service. Proper reimbursement by a federal insurance program is predicated on a physician's determination of medical necessity. But FMC's CPX scheme does precisely the opposite: implementing a policy that mandates unnecessary laboratory testing without any determination as to medical necessity.

113.    In order to "justify" these labs to third-party payors, FMC uses two billing strategies. First, FMC regularly uses "catch-all" codes like "V58.69" which indicates long term, current use of high risk medications (such as opiates) that might justify ordering diagnostic laboratory monitoring. This fraud also adds seriously misleading medical information to a patient's chart.

114.    FMC also gets unnecessary labs "covered" by simply miscoding the CPX visit as a problem-oriented visit. An example of FMC's practice of ordering unnecessary labs and up-coding CPXs is Jane Doe 5's Superbill, discussed *supra*.

115.    Another example of this practice is illustrated by Jane Doe 8's April 8, 2013 Superbill. On that occasion, Dr. Schaefer saw Jane Doe 8 for a subsequent AWV.

116.    While Dr. Schaefer deemed it medically necessary to order a number of labs (Dr. Schaefer's orders are circled) to evaluate several chronic problems including elevated glucose, gout, B-12 deficiency, and high cholesterol, an unknown FMC nurse gratuitously ordered Jane Doe 8 to also undergo an EKG as indicated by the checkmark on her Superbill.

117.    Jane Doe 8 is a Medicare insured patient.

118.    As another example, Jane Doe 9 saw Dr. Schaefer on June 28, 2013, for a detailed office visit, but another FMC employee went behind Dr. Schaefer and ordered Jane Doe 9 to undergo an unnecessary EKG and chest x-ray.

119.    In addition ordering unnecessary laboratory testing, FMC also up-codes medically necessary labs by requiring physicians to order more inclusive panel testing when a less expensive individual test would suffice.

120.    A "panel" includes multiple individual laboratory tests ordered together as a single laboratory service. Often these tests are grouped together as panels because they offer related diagnostic testing.

121.    FMC prohibits its physicians from ordering the individual tests included in the panels listed on their Superbill.

122.    FMC also encourages overutilization of panel labs by designing its Superbill so as to exclude commonly used stand-alone tests thus forcing physicians to choose between finding the proper stand-alone code or merely circling the panel test as provided by FMC.

123.    But the panel tests featured on FMC's Superbill were created, not using the CMS guidelines for approved panels, but for the express purpose of bundling together as many billable services under a single panel.

124.    For example, FMC's "Chem Panel 8 M," created by Victoria Serbin, includes five separate CPT Codes. Ms. Serbin is not a physician, a nurse, or a certified medical coder.

125.    On one such occasion, Dr. Schaefer declined to order a full thyroid panel and instead ordered the stand-alone, medically-necessary "Thyroid-Stimulating Hormone (TSH) lab. Afterward, she was admonished by both Serbin and FMC lab supervisor, Jocelyn Bladen, for ordering a stand-alone procedure.

26

126.     After the patient's Superbill was changed by unknown lab personnel, Dr. Schaefer's patient received a $700 bill for the unnecessary lab services.

127.     On numerous other occasions, Dr. Schaefer ordered a single lab test only to later discover it was overridden by another FMC employee—at an increase in cost, for example, from $20 to $300.

128.     Dr. Schaefer has personally witnessed laboratory miscoding for anemia, chemistry, lipid, and thyroid panels.

129.     This systematic overutilization and up-coding of laboratory diagnostic services is extremely profitable to FMC because most of these labs are performed by FMC's in-house laboratory. Dr. Schaefer believes that up to 50 percent of FMC's annual revenue is generated by in-house lab tests.

**E.     FMC's Retaliatory Termination of Dr. Schaefer.**

130.     During her seven-month tenure at FMC, Dr. Schaefer was repeated admonished by Serbin for refusing to adopt FMC's billing practices. Dr. Schaefer was also chastised for attempting to correct erroneous and fraudulent billing instructions given to FMC's billing staff.

131.     On or about September 2013, Dr. Schaefer requested a private meeting with Serbin in order to discuss leaving FMC.

132.     On or about October 4, 2013, Dr. Schaefer met with Serbin and Williams and told Serbin that she wanted to leave FMC.

133.     Among other details, Dr. Schaefer and Serbin agreed at that meeting that FMC would release Dr. Schaefer from her contractual non-compete agreement and that the parties would have an amicable separation

134.    The following week on or about October 8, 2013, Dr. Schaefer met with Serbin at lunch. Dr. Schaefer understood the purpose of this lunch to be the formal execution of the terms of separation to which they previously agreed.

135.    Instead, Dr. Schaefer received an elaborate memorandum (dated October 1) from Serbin purporting to provide Dr. Schaefer with written notice of alleged deficiencies and concerning her employment.

136.    Serbin's memorandum falsely accuses Dr. Schaefer, among other things, of failing to properly document procedures she has ordered. During their lunch meeting, Dr. Schaefer explained that the problem was not her failure to dictate orders, but the FMC staffs' insistence that she create physician notes capable of justifying fraudulent charges.

137.    Upon returning to the office that afternoon, Dr. Schaefer received a phone call from FMC's collections and billing manager, Melanie Strickland who indicated she had spoken to Serbin.

138.    Dr. Schaefer repeated what she had told Serbin, telling Strickland that FMC staff was miscoding and up-coding her patients' Superbills, referring specifically to CPXs. Strickland replied, "we only do that for Medicare and Tricare patients because they won't pay for a physical."

139.    Notwithstanding their October 4 agreement to amicably separate, Serbin's backdated October 1 memorandum explicitly threatened Dr. Schaefer to comply with FMC's practices or face termination.

140.    On November 6, 2013, FMC terminated Dr. Schaefer by way of a Written Notice of Termination from Serbin. This letter accuses Dr. Schaefer of many of the same falsehoods raised by Serbin's memorandum one month earlier.

141.    However, the same day that FMC terminated Dr. Schaefer, allegedly "for cause," it also offered Dr. Schaefer a Separation Agreement promising to pay Dr. Schaefer $16,925.00 (two months' pay) in exchange for certain consideration.

142.    Specifically, FMC's prosed Separation Agreement asked Dr. Schaefer to affirm that, "by executing this Agreement, you acknowledge that you have not been aware of any violation of federal, state or local laws, rules or regulations that applies [sic] to the Practice and its operations during your employment."

143.    In light of the foregoing, Dr. Schaefer refused to sign this false statement and responded via email dated November 8, 2013 that she would not sign the proposed Separation Agreement unless this false statement was removed.

144.    By memorandum dated November 11, 2013, Serbin replied insisting that she accede to the false certification as initially proposed and accusing Dr. Schaefer of the illegal conduct at issue in this action.

145.    Dr. Schaefer refused to submit to this demand and sign any false statement. This action followed.

**COUNT I**
**VIOLATIONS OF 31 U.S.C. § 3729(a)(1)(A) & (B)[3]**
**BY SUBMITTING CLAIMS FOR SERVICES AND SUPPLIES**
**NOT RENDERED OR IN EXCESS OF THOSE ACTUALLY PROVIDED**
**(AGAINST ALL DEFENDANTS)**

146.    Dr. Schaefer re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

---

[3] To the extent wrongdoing occurred prior to May 20, 2009, this Complaint also alleges violations of the federal False Claims Act prior to its recent amendments e.g., 31 U.S.C. § 3729(a)(1).

147.    At all times relevant to this action, Defendants were legally obligated to only bill federally insured patients for services and supplies actually provided.

148.    At all times relevant to this action, Defendants were also legally obligated to take corrective action upon discovering that they received payment for services not actually provided.

149.    Instead, Defendants knowingly and willfully miscoded and up-coded patient bills in the manner described above, including but not limited to:

      a.    Double billing for medical services by, for example, charging patients for an office visit in addition to a procedure visit in the absence of an independent patient complaint;

      b.    Double billing for medical supplies by, for example, charging patients for the cost of medical supplies already included in a procedure code;

      c.    Miscoding preventative office visits as problem-oriented visits;

      d.    Up-coding problem-oriented office visits;

      e.    Falsifying medical and billing records to justify these charges; and

      f.    In other such ways as discovered during the litigation of this action.

150.    Defendants knowingly created these false billing documents in order to obtain payment for services and/or supplies that were either not provided or for which Defendants has already been compensated pursuant to another claim.

151.    Defendants also knowingly created false documents, like physician notes, in an effort to conceal the falsity of these fraudulently created billing documents.

152.    These materially false billing statements were presented to Medicare and Tricare, or to their administrative contracting agent, for payment.

153.     Defendants knew that the Medicare and Tricare insurance programs relied on and continue to rely on their false certification that their claims for payment are based on services and supplies that are actually provided and medically necessary.

154.     Defendants' fraudulent claims were presented and paid and continue to be presented and paid by Medicare and Tricare at great cost to United States taxpayers.

155.     Defendants' conduct is a violation of 31 U.S.C. § 3729(a)(1)(A) & (B), as amended.

**COUNT II**
**VIOLATIONS OF 31 U.S.C. § 3729(a)(1)(A) & (B)[4]**
**SUBMITTING CLAIMS FOR MEDICALLY UNNECESSARY SERVICES**
**(AGAINST ALL DEFENDANTS)**

156.     Dr. Schaefer re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

157.     At all times relevant to this action, Defendants were legally obligated to only bill federally insured patients for medically necessary services.

158.     At all times relevant to this action, Defendants were also legally obligated to take corrective action upon discovering that they received payment for medically unnecessary services.

159.     Instead, Defendants knowingly and willfully over-utilized medical services in the manner described above, including but not limited to:

    a.     Ordering medically unnecessary laboratory testing, such as blood, urine, EKG, and x-ray tests;

    b.     Ordering medically unnecessary panel testing when a single stand-alone test would suffice;

---

[4] To the extent wrongdoing occurred prior to May 20, 2009, this Complaint also alleges violations of the federal False Claims Act prior to its recent amendments e.g., 31 U.S.C. § 3729(a)(1).

31

    c.      Prohibiting physicians from ordering a less expensive stand-alone test;

    d.      Implementing standing orders whereby laboratory testing is ordered without a determination as to medical necessity;

    e.      Allowing non-physician staff to order patients to undergo laboratory testing;

    f.      Falsifying medical and billing records to justify laboratory testing; and

    g.      In other such was as discovered during the litigation of this action.

160.    Defendants knowingly created these false billing documents in order to obtain payment for these services which were not medically necessary.

161.    Defendants also knowingly created false documents, like physician notes, in an effort to conceal the falsity of these fraudulently created billing documents.

162.    These materially false billing statements were presented to Medicare and Tricare, or to their administrative contracting agent, for payment.

163.    Defendants knew that the Medicare and Tricare insurance programs relied on and continue to rely on their false certification that their claims for payment are based on services that are medically necessary.

164.    Defendants' fraudulent claims were presented and paid and continue to be presented and paid by Medicare and Tricare at great cost to United States taxpayers.

165.    Defendants' conduct is a violation of 31 U.S.C. § 3729(a)(1)(A) & (B), as amended.

**COUNT III**
**VIOLATION OF 31 U.S.C. § 3730(h)**
**RETALIATING AGAINST PLAINTIFF-RELATOR**
**(AGAINST ALL DEFENDANTS)**

166.    Dr. Schaefer re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth below.

167.    Dr. Schaefer has personal knowledge of Defendants' false claims by virtue of her former employment at FMC.

168.    Dr. Schaefer objected to many of the above-described practices.

169.    After Dr. Schaefer confronted Serbin about these practices, she was terminated.

170.    Dr. Schaefer's termination was contrary to the amicable separation agreement Dr. Schaefer reached with Serbin during her October 4 meeting.

171.    Instead of adhering to those previously agreed terms, Serbin demanded that Dr. Schaefer falsely state that she was unaware of Defendants' illegal conduct.

172.    Defendants terminated Dr. Schaefer in retaliation for her refusal to participate in this false claims scheme and her effort to stop Defendants' wrongful conduct.

173.    As a result of his termination, Dr. Schaefer lost income she would have otherwise earned.

174.    Defendants' conduct is violation of 31 U.S.C. § 3730(h), as amended

**PRAYER**

WHEREFORE, Plaintiff-Relator on behalf of herself and the United States, pursuant to 31 U.S.C. § 3730 prays:

(a)    That Defendants cease and desist from violating the federal False Claims Act, 31 U.S.C. §§ 3729 et seq.;

(b)    That this Court enter judgment against Defendants:

     i.   Awarding an amount equal to three times the damages that the United States has sustained because of Defendants' conduct, plus civil penalties of at least $5,000 to $10,000, adjusted upward as specified by applicable law, for each act in violation of 31 U.S.C. § 3729;

     ii.   Awarding Plaintiff-Relator the appropriate bounty pursuant to 31 U.S.C. § 3730; and

     iii.   Awarding Plaintiff-Relator attorneys' fees and costs of this action, plus interest, including the costs to the United States for its expenses related to this action;

(c)   That Defendants disgorge all sums by which they have been unjustly enriched by their wrongful conduct;

(d)   That Plaintiff-Relator receive two times the back pay she is owed from the date of her wrongful termination, plus interest, special damages, costs, and attorneys' fees, pursuant to 31 U.S.C. § 3730(h);

(e)   That the United States and Plaintiff-Relator receive all relief, both at law and at equity, to which they may reasonably be entitled; and

(f)   That the Court order such further relief as it deems just and proper.

## **REQUEST FOR TRIAL BY JURY**

Plaintiff-Relator hereby demands a trial by jury.

[signature page follows]

34

Respectfully submitted by:


s/ Richard A. Harpootlian
Richard A. Harpootlian (Fed. ID # 1730)
rah@harpootlianlaw.com
Christopher P. Kenney (Fed. ID # 11314)
cpk@harpootlianlaw.com
RICHARD A. HARPOOTLIAN, P.A.
1410 Laurel Street
Post Office Box 1090
Columbia, SC 29202
Telephone: (803) 252-4848
Facsimile: (803) 252-4810

Herbert W. Louthian Jr. (Fed. ID # 2729)
bert@louthianlaw.com
LOUTHIAN LAW FIRM, P.A.
P.O. Box 1299
Columbia, SC 29202
Telephone: (803) 454-1200
Facsimile: (803 256-6033

ATTORNEYS    FOR    PLAINTIFF-RELATOR
CATHERINE A. SCHAEFER, M.D.

Columbia, South Carolina
February 12, 2014