**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 3:14-cv-00382-MBS |
| | ) | |
| *ex rel.* CATHERINE A. SCHAEFER, M.D., | ) | |
| | ) | |
| Plaintiff-Relator, | ) | |
| | ) | **PLAINTIFF-RELATOR'S** |
| v. | ) | **AMENDED COMPLAINT** |
| | ) | |
| FAMILY MEDICINE CENTERS OF | ) | **(Jury Trial Demanded)** |
| SOUTH CAROLINA, LLC, STEPHEN F. | ) | |
| SERBIN, M.D., PETER J. STAHL, M.D., | ) | |
| and VICTORIA SERBIN, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Plaintiff Catherine A. Schaefer, M.D., files this complaint of whistleblower retaliation pursuant to the employee protection provisions of the federal False Claims Act, 31 U.S.C. § 3730(h), against her former employer Family Medicine Centers of South Carolina, LLC and Stephen F. Serbin, M.D., and does allege and will show unto this Honorable Court as follows:

### JURISDICTION

1. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732 as this action presents federal questions under the False Claims Act, 31 U.S.C. § 3730(h).

2. This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) and because Defendants transact business in this District and numerous acts and omissions giving rise to this complaint occurred in the District of South Carolina.

3. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732(a) because at least one of the Defendant conducts business in this District and the claims giving rise to this complaint occurred in this District.

## PARTIES

4. Plaintiff-Relator Catherine A. Schaefer, M.D., is a medical doctor with a master's of science in molecular genetics. Dr. Schaefer earned her medical degree from the University of South Carolina's School of Medicine in 1994. In 2003, Dr. Schaefer opened her own private family medical practice. In the decade that followed, she built a successful solo practice of approximately 3,000 patients, many of whom were insured through Medicare and Tricare. As a solo practitioner with a small support staff, Dr. Schaeffer took care to educate herself about Centers for Medicare & Medicaid Services (CMS) billing regulations and comport her billing practices with federal law. In April 2013, Dr. Schaefer closed her practice and went to work at FMC's Springwood Lake Family Practice location in Northeast Columbia, bringing with her the 3,000-patient practice she built over the previous ten years. On November 6, 2013, FMC terminated Dr. Schaefer for objecting to the illegal practices at issue here.

5. The United States of America has filed an Intervenor Complaint (Dkt. No. 57) pursuant to 31 U.S.C. § 3730(b)(4)(A).

6. Defendant Family Medicine Centers of South Carolina, LLC (FMC) is a limited liability corporation incorporated under the laws of the State of South Carolina. FMC is believed to be the largest family practice healthcare provider in Columbia, South Carolina serving approximately 40,000 patients at six office locations with an estimated annual revenue of $18.97 million. Medicare and Tricare are the practice's largest third-party payor sources.

7.      Defendant Stephen F. Serbin, M.D. (Serbin), is a citizen of the State of South Carolina and is believed to be a resident of Richland County. Serbin is the CEO & Medical Director of FMC and one of the owners and members of FMC. Both in writing and in person, Serbin directs and coaches FMC physicians, nurses, and billing staff on how to overbill FMC patients in order to generate revenue. As both a member of FMC's limited-liability corporation and as its CEO, the ill-gotten profits earned by FMC inure directly to Serbin in the form of salary, bonuses, and member distributions.

8.      The retaliation claim joined here is not directed at Defendants Peter J. Stahl, M.D. and Victoria Serbin.

## FACTUAL ALLEGATIONS

9.      When Dr. Schaefer joined FMC on April 1, 2013, she brought with her approximately 3,000 patients that she had cultivated during her 10 years as a solo practitioner. During this time she formed a close doctor-patient relationship with many of her patients such that they had grown accustomed to the care and precision offered by Dr. Schaefer's solo practice.

10.     Shortly after joining FMC, a number of Dr. Schaefer's patients began complaining about inaccurate billing, then being handled by FMC. For example, in April 2013, Dr. Schaefer was confronted by John Doe 1,[1] one of her longtime patients who received regular B-12 vitamin shots. John Doe 1 complained that, unlike Dr. Schaefer's solo practice, the FMC billing department required him to make a co-pay for the administration of his B-12 shot.

11.     John Doe 1's Superbill indicated that he was being billed for a nursing visit—a Level 1 office visit (CPT Code 99211)—in addition to the injection procedure. John Doe 1 was

---

[1] Patients shall be referred to as John and Jane Doe in order to protect their privacy.

3

being charged a co-pay because, unlike Dr. Schaefer's practice before, FMC had added a problem-related office visit code to his Superbill.

12.     In an effort to resolve John Doe 1's complaint, Dr. Schaefer spoke to Emily Williams, FMC's Senior Practice Administrator. Dr. Schaefer provided Williams with Medicare literature explaining that the guidelines do not authorize charging for a separate problem-related nursing visit in addition to the B-12 injection procedure when a provider merely administers an injection and nothing more.

13.     Several days later, Williams spoke to Dr. Schaefer and told Dr. Schaefer that she had looked into it and that Dr. Schaefer was correct and that she would change the practice in the FMC billing department.

14.     But several weeks after this conversation, John Doe 1 returned for another B-12 injection and again complained to Dr. Schaefer that he was, once again, improperly charged a co-pay for his injection. John Doe 1 again provided his Superbill to Dr. Schaefer.

15.     Dr. Schaefer took the Superbill to Rachel Lovato, FMC's Front Office Supervisor, and explained it was incorrect. Lovato told Dr. Schaefer that she had spoken to Vicki Serbin, the Clinical Services Manager in charge of reviewing or "scrubbing" all of FMC's claims to third party payors such as Medicare or Tricare. Lovato informed Dr. Schaefer that Vicki Serbin told her it was "ok" to bill for a nursing visit and charge a co-pay in addition to the injection procedure.

16.     After this incident with John Doe 1, Dr. Schaefer reviewed a number of other patients' files who she knew to regularly receive B-12 injections. Dr. Schaefer also reviewed a number of patient files that she knew to regularly receive testosterone injections and flu shots. These files evidenced a widespread practice of billing patients (and their insurers) for nursing

visits any time an injection procedure is administered and charging patients for an office visit co-pay.

17.     Dr. Schaefer witnessed other incidents that raised her suspicions concerning FMC's billing practices. For example, within her first couple weeks at FMC, FMC received notice of a CMS audit. CMS regularly audits a selection of patient files to ensure compliance with CMS guidelines. Prior to the audit, Dr. Schaefer witnessed Elizabeth Skipper, FMC's Nursing Supervisor, moving a large number of patient charts into a procedure room. Skipper told Dr. Schaefer that she was moving the charts into the procedure room so they could be reviewed by FMC prior to the CMS audit. Dr. Schaefer believes FMC was "scrubbing" these charts to ensure they included physician notes capable of justifying the services billed.

18.     After making these initial discoveries, Dr. Schaefer began investigating other questionable FMC practices. Her findings evidence a concerted effort by the Defendants to fraudulently increase healthcare services billed to patients and their insurers, including federal insurance programs, in excess of the fees actually earned or justified as medically necessary. These schemes, described below, generally fall into one of four categories.

   i. First, Defendants systematically double bill patients and their insurance providers for medical services and supplies included in the cost of the proper procedure code. Even when insurers refuse to pay these duplicative costs, FMC still attempts to collect from patients by charging co-pays and engaging in balance billing.

   ii. Second, Defendants systematically miscode preventative office visits, such as physicals, as problem related visits and up-code legitimate problem-related office visits at a higher level than is medically justified given the complexity of the problem presented by the patient.

   iii. Third, Defendants have adopted "standing orders" whereby patients undergo extensive laboratory testing as a matter of course and without a physician determining that such testing is medically necessary.

        iv.        Fourth, when labs are medically necessary, Defendants require physicians to order expensive panel tests that include unnecessary tests in addition to the medically necessary test that could be obtained as a stand-alone test at less cost.

19.     Upon discovering these practices, Dr. Schaefer made a good faith effort to bring them to the attention of FMC staff by explaining proper billing practices. When these efforts were unsuccessful, Dr. Schaefer complained to Serbin in an effort to alert him of this fraud and solicit his assistance in correcting these practices. As the architect of these practices and FMC's efforts to conceal them, Serbin rebuffed Dr. Schaefer and accused her of impropriety in an effort to bully her into complicity.

20.     During her seven-month tenure at FMC, Dr. Schaefer was repeated admonished by Serbin for refusing to adopt FMC's billing practices. Dr. Schaefer was also chastised for attempting to correct erroneous and fraudulent billing instructions given to FMC's billing staff.

21.     On or about September 2013, Dr. Schaefer requested a private meeting with Serbin in order to discuss leaving FMC.

22.     On or about October 4, 2013, Dr. Schaefer met with Serbin and Williams and told Serbin that she wanted to leave FMC.

23.     Among other details, Dr. Schaefer and Serbin agreed at that meeting that FMC would release Dr. Schaefer from her contractual non-compete agreement and that the parties would have an amicable separation.

24.     The following week on or about October 8, 2013, Dr. Schaefer met with Serbin at lunch. Dr. Schaefer understood the purpose of this lunch to be the formal execution of the terms of separation to which they previously agreed.

25. Instead, Dr. Schaefer received an elaborate memorandum (dated October 1) from Serbin purporting to provide Dr. Schaefer with written notice of alleged deficiencies concerning her employment.

26. Serbin's memorandum falsely accuses Dr. Schaefer, among other things, of failing to properly document procedures she has ordered. During their lunch meeting, Dr. Schaefer explained that the problem was not her failure to dictate orders, but the FMC staffs' insistence that she create physician notes capable of justifying fraudulent charges.

27. Upon returning to the office that afternoon, Dr. Schaefer received a phone call from FMC's collections and billing manager, Melanie Strickland who indicated she had spoken to Serbin.

28. Dr. Schaefer repeated what she had told Serbin, telling Strickland that FMC staff was miscoding and up-coding her patients' Superbills, referring specifically to CPXs. Strickland replied, "we only do that for Medicare and Tricare patients because they won't pay for a physical."

29. Notwithstanding their October 4 agreement to amicably separate, Serbin's backdated October 1 memorandum explicitly threatened Dr. Schaefer to comply with FMC's practices or face termination.

30. On November 6, 2013, FMC terminated Dr. Schaefer by way of a Written Notice of Termination from Serbin. This letter accuses Dr. Schaefer of many of the same falsehoods raised by Serbin's memorandum one month earlier.

31. However, the same day that FMC terminated Dr. Schaefer, allegedly "for cause," it also offered Dr. Schaefer a Separation Agreement promising to pay Dr. Schaefer $16,925.00 (two months' pay) in exchange for certain consideration.

32. Specifically, FMC's prosed Separation Agreement asked Dr. Schaefer to affirm that, "by executing this Agreement, you acknowledge that you have not been aware of any violation of federal, state or local laws, rules or regulations that applies [sic] to the Practice and its operations during your employment."

33. In light of the foregoing, Dr. Schaefer refused to sign this false statement and responded via email dated November 8, 2013 that she would not sign the proposed Separation Agreement unless this false statement was removed.

34. By memorandum dated November 11, 2013, Serbin replied insisting that she accede to the false certification as initially proposed and accusing Dr. Schaefer of the illegal conduct at issue in this action.

35. Dr. Schaefer refused to submit to this demand and sign any false statement. This action followed.

## COUNT I
## VIOLATION OF 31 U.S.C. § 3730(h)
## RETALIATING AGAINST PLAINTIFF-RELATOR
## (AGAINST DEFENDANTS FMC AND S. SERBIN)

36. Dr. Schaefer re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth below.

37. Dr. Schaefer has personal knowledge of Defendants' false claims by virtue of her former employment at FMC.

38. Dr. Schaefer objected to many of the above-described practices.

39. After Dr. Schaefer confronted Serbin about these practices, she was terminated.

40. Dr. Schaefer's termination was contrary to the amicable separation agreement Dr. Schaefer reached with Serbin during her October 4 meeting.

41. Instead of adhering to those previously agreed terms, Serbin demanded that Dr. Schaefer falsely state that she was unaware of Defendants' illegal conduct.

42. Defendants terminated Dr. Schaefer in retaliation for her refusal to participate in this false claims scheme and her effort to stop Defendants' wrongful conduct.

43. As a result of her termination, Dr. Schaefer lost income she would have earned.

44. As a result of her wrongful termination, Dr. Schaefer and her family suffered financial hardship they otherwise would not have endured.

45. Defendants' conduct is violation of 31 U.S.C. § 3730(h), as amended.

## PRAYER

WHEREFORE, Plaintiff-Relator prays:

(a) That she receive two times the back pay she is owed from the date of her wrongful termination, plus interest, special damages, costs, and attorneys' fees, pursuant to 31 U.S.C. § 3730(h);

(b) That she receive all relief, both at law and at equity, to which she may reasonably be entitled; and

(c) That the Court order such further relief as it deems just and proper.

## REQUEST FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

[signature page follows]

9

Respectfully submitted by:

s/Richard A. Harpootlian
Richard A. Harpootlian (Fed. ID No. 1730)
rah@harpootlianlaw.com
Christopher P. Kenney (Fed. ID No. 11314)
cpk@harpootlianlaw.com
RICHARD A. HARPOOTLIAN, P.A.
1410 Laurel Street
Post Office Box 1090
Columbia, SC 29202
Telephone: (803) 252-4848
Facsimile: (803) 252-4810

Herbert W. Louthian Jr. (Fed. ID No. 2729)
bert@louthianlaw.com
LOUTHIAN LAW FIRM, P.A.
P.O. Box 1299
Columbia, SC 29202
Telephone: (803) 454-1200
Facsimile: (803 256-6033

ATTORNEYS FOR PLAINTIFF
CATHERINE A. SCHAEFER, M.D.

May 6, 2016
Columbia, South Carolina.